## STATE OF MISSOURI, Respondent, v. ALBERT FELDMAN, Appellant.

**St. Louis Court of Appeals, June 28, 1910.**

1. **INTOXICATING LIQUORS: Sale to Minor: Defenses.** It is no defense against a prosecution, under section 2179, Revised Statutes 1899, for selling to a minor without written permission of his parent, that the seller believed the buyer was of full age, or that his father gave his verbal consent, or afterwards ratified the sale in writing, or that the minor bought as an agent for an adult, if he did not disclose the fact to the seller, but if he did, the sale is to be taken as made to the principal and not to the minor.

2. ———: ———: ———. Neither is it a defense that the dealer was enticed into selling illegally by persons furnished money by citizens, so a sale might be induced and the dealer prosecuted, although this doctrine is offensive to one's sense of justice.

3. ———: ———: Evidence Held to Show Statute was Not Violated. In a prosecution for selling intoxicating liquor to a minor, in violation of section 2179, Revised Statutes 1899, the evidence showed the prosecuting witness was a lad not eighteen years old, who had not been emancipated and was under the control of his father; that the father had received money to use in their occupation of detectives, from the Anti-Saloon League and had turned over part of it to the son; that when they arrived at defendant's store the father told the son to go in and get some beer, not as a beverage, but as evidence of selling to minors—told the son to get defendant to sell to him, as that would be selling to a minor and a violation of law, and when defendant refused to sell at retail, they left, but later concluded to go back and try defendant again; that the father believed the son was the one to be pushed to the front to get defendant to violate the law, and father and son had that agreement and understanding; that defendant brought the liquor out from the store and placed it in the buggy in which the father was sitting, the son having paid for it inside the store, the amount of which payment the father accounted for in his report of expenses. *Held*, the father was the directing and ruling spirit in the transaction and the boy was used as a decoy and that the liquor was sold to the father and not to the minor, within the meaning of the statute.

State v. Feldman.

4. PARENT AND CHILD: Wages of Minor Presumably Go to Father. A father has the right to control his minor son, and where there is no proof he had emancipated the son or given his wages to him, such wages presumably go to the father.

Concurring Opinion by Reynolds, P. J.

5. CRIMINAL LAW: Detective Entrapping Defendant. Where the principal witness for the prosecution testified he had been engaged for two years in trying to get people to violate the law he was *particeps criminis*, and one entrapped by such means should not be held guilty.

Appeal from Pike Circuit Court. —*Hon. David·H. Eby,* Judge.

REVERSED.

*E. W. Major* and *Tapley & Fitzgerrell* for appellant.

*L. G. ·Blair* for respondent.

GOODE, J.—Defendant was convicted of selling intoxicating liquor (beer) to a minor, and appealed from his sentence. Two persons, Louis Wein, Sr., and Louis Wein, Jr., father and son, were in the employ of the Anti-Saloon League as detectives to hunt down violations of the law against the sale of intoxicants in the State. Louis Wein, Jr., testified he was born May 17, 1890, and as the beer was sold November 28, 1907, he was, on the date of the sale, between seventeen and eighteen years old. Defendant's father conducted a store in Pike county at a place called St. Clements. In the prosecution of their employment to discover and induce violations of the liquor laws, the two Weins were driving from place to place in Pike county, endeavoring to purchase intoxicants illegally from liquor sellers. They thought it was territory where the local option statutes had been adopted and that any sale of an intoxicating liquor there was prohibited, so Louis Wein, Jr., testified. They visited various towns, including

Ashley, Bowling Green and St. Clements, and at the latter place entered Feldman's store about two o'clock in the afternoon and attempted to buy beer or whiskey at retail, from the defendant. While the father remained in the buggy, Louis Wein, Jr., went into the store and asked defendant if he would sell a small quantity of beer or whiskey, and defendant refused to sell except at wholesale, as his father had a wholesale government license. Louis Wein, Jr., told his father defendant would not sell anything under a case of beer and the two drove away. They talked the matter over to this effect, quoting from the testimony of the son:

"We said if he sold it to me he was violating the law, and if he sold it to my father he was not, and the reason that I went in and bought it was because if my father had bought it there would be no case against him, and it was agreed between my father and I, that I was the one to be *pushed to the front* to get him to violate the law, and we had that agreement and that understanding between my father and myself; I went in to try to buy the beer or whiskey and succeeded. Albert Feldman was in the store behind the counter when I went in the second time. I told him to give me a case of beer, and he asked me if I wanted pint or quart bottles, and there was some difference in the price and I took quart bottles and he went down to the cellar and got the bottles and brought it out and put it in the buggy, and I paid him for it, and he said when I brought the case of empty bottles back I would get $1.50 or something like that for the empty cases and the bottles, and I paid him $4.50. At the time I had this conversation, Feldman was standing about back of the store. Up to this time my father had not seen Feldman. I do not think he knew what kind of a man he was. He might have seen him through the door or window. My father had not been in the store. I do not remember of him saying anything to my father when he put the case in the buggy, nor do I remember of my father saying anything to him.

My father was sitting in the buggy at the time he put the case in.  He did not know who was in the buggy, whether it was my father or not.  He asked me whether I wanted pints or quarts, and did not ask my father and I paid for the beer.  I most always carry all the money out on the trips.  My father carries some money; but I carry the most of it.  I have more expenses than he.  I have worked as detective for the government myself both in civil and criminal cases.  I was a detective under W. E. Johnson in Indian Territory.  I have been engaged for two years in trying to get people to violate the law.  I have been in the employ of the Anti-Saloon League since September last.  I have worked in seventeen different states in the Union for the Anti-Saloon League.  I have worked in this state from September, but for the Anti-Saloon League for the last two years. I now have three states on hands to work in.  Missouri, Kansas and Illinois.  The Anti-Saloon League pays me for my work.  I have not been engaged in Pike county except on this occasion.  Feldman did not ask me what my business was that I remember of, and I might have told him I was a drummer.  At least I did not tell him my business.  If he asked me my business, I would not have told him I was a detective.  We took the beer to Mr. Whiteside's and asked him if we could leave it there.  My father and I acted together in some ways and in some ways we did not.  We acted together when we were trying to get some parties to sell whiskey to minors, or selling in a particular town, or selling without a license, according to the kind of a case we were working on, or what the man was to be arrested for; but if the man had no right to sell it, had no retail license and you could buy it, buy whiskey, and have him violate the law, we acted together, if it was an offense to sell it at all sometimes."

Wein, Jr., testified that before leaving St. Louis, the superintendent of the Anti-Saloon League had given money to his father and the latter had turned over part

of the money to him. It was with this money the beer was bought. Wein, Sr., testified he and his son drove to defendant's place of business, the son went in, then came out and said he could buy three gallons of whiskey or a case of beer; that the two Weins then drove away and afterwards came back, when the son went in again, and he and defendant carried out a case of beer and put it in the buggy where the father sat; that he (Louis Wein, Sr.) never gave defendant a written order to sell whiskey to his son. The witness gave testimony about being a detective for the Anti-Saloon League and endeavoring to induce violations of the liquor law at various places; that he was not aware when he called at Feldman's place of business the latter only had a license to sell at wholesale and could not sell in small quantities; that he did not hear the conversation between his son and Feldman in the first instance, but his son told him what occurred. The witness then gave this testimony:

"When we left St. Clements we went back to Mr. Whiteside's who lives in the edge of the town of Ashley, and after talking with him, my son and I concluded to go back to St. Clements and try Feldman again. My son and I did not talk about how to get the beer from Feldman on our way back. When we arrived at St. Clements I told my son to go in to get the beer, that is, not as a beverage, but as evidence, selling to minors. My son knew his business and I did not have to instruct him. I told my son to get him to sell to him and that would be selling to minors, and if he did, that would be a violation of the law. I told him that on the road back after the first trip with him. Feldman came out to the buggy with the beer. That is, my son and Feldman brought it out and put it in the front of my buggy, and I said nothing. My son paid Feldman inside of the store before he came out with the beer. I did not see him pay him, but that is my judgment. I did not see the money pass, but all the whiskey he gets in his life

he has to pay for it. He had money in his pocket, and I gave him more money when he left. I gave him twenty-five dollars for expenses. He pays all expenses. I gave him twenty-five dollars in St. Louis."

Further testifying the witness said he included the price of the beer in the account of expenses he turned in to the Anti-Saloon League; put in $4.50 for the beer; said his son had been with him in this detective business for about five years. Such was the material testimony for the State. According to the testimony for defendant, on both visits of the Weins to his store, he talked with the father and conducted the negotiation for the sale of the beer with him. He testified "the old gentleman in the buggy said he would take quarts, wanted quart bottles;" that after receiving this order defendant went into the store to give a receipt and the young man followed with the money in his hand to pay for the beer; defendant handed the young man a receipt and took the money from him; he had never seen the two Weins before; he delivered the beer to the father in the buggy; did not ask the young man's name, but did ask the father's name and was told it was Carl Wein. The court refused to direct a verdict for defendant at the conclusion of the testimony for the state, and after all the testimony was in, left it to the jury to decide whether the sale had been made to the father or to the son, directing a verdict for defendant if they found the sale was to the father and a verdict against defendant if they found it was to the son. The contention on the appeal is the only fair inference from the evidence is that the father bought the beer. The statute forbids the selling, giving away, otherwise disposing of, furnishing or delivering any intoxicating liquor to a minor without the written permission of his parent or guardian. [R. S. 1899, sec. 2177.] These points have been decided: It is no defense against a prosecution for selling to a minor that the seller believed the buyer was of full age, or the father of the minor afterwards

ratified the sale in writing (State v. Bruder, 35 Mo. App. 475); nor is it a defense to a prosecution for the violation of this and cognate statutes, that the father gave verbal consent (State v. Johnson, 44 Mo. App. 84); or that the minor bought as agent for an adult person, if he did not disclose the fact to the seller (State v. Mc-Lain, 49 Mo. App. 398); but if he did disclose it, the sale is to be taken as made to the principal and not to the minor (Id.). It has been ruled to be no defense that the liquor dealer was enticed into selling illegally by persons who had been furnished money by citizens, so a sale might be induced and the dealer prosecuted (State v. Lucas, 94 Mo. App. 117); a doctrine offensive to one's sense of justice. With the decisions in this posture, the only theory on which defendant can be exonerated is that the evidence shows conclusively the sale was to Louis Wein, Sr., and not to the son. Beyond doubt, according to his own testimony, the father was a party to the purchase, and, indeed, was a purchaser of the beer. The only debatable point is whether the son was a co-purchaser; whether the sale was to both of them, and hence to a minor as well as to a man of full age. Scrutinizing the testimony of the two Weins closely, without taking account of what defendant testified, it is apparent the father was the directing and ruling spirit in the transaction and the boy was used as a decoy. He had the right to control his son and there is no proof he had emancipated the boy or given the latter his wages, which presumably went to the father. [21 Ency. Law (2 Ed.), p. 1040; Schouler's Dom. Rel. (5 Ed.), sec. 252; Emery v. Kempton, 2 Gray (Mass.) 257.] The son was a lad not eighteen years old; the father had received money to use in their occupation of detectives for the Anti-Saloon League and had turned over part of it to his son; the father accounted for the beer bought of defendant in his report of expenses. He testified that when they arrived at St. Clements he told his son to go in and get the beer; not as a beverage,

State v. Feldman.

but as evidence of selling to minors; told his son to get defendant to sell to him (his son) as that would be selling to a minor, and if he did that it would be a violation of the law. He testified further that he talked with his son when the two left defendant's store after the first visit, and they concluded to go back to St. Clements and try Feldman again. Young Wein testified he and his father agreed that he (the son) "was the one to be pushed to the front to get him (defendant) to violate the law; and we had that agreement and that understanding between my father and myself."

We hold on the evidence of the State the beer was sold to the father, and not to the minor within the meaning of the statute on which the information is founded, which, in our opinion was not intended to create an offense on such facts as we have here. The facts show no violation of the statute, considering its spirit and purpose and the offense it was enacted to prevent; hence the judgment will be reversed and the defendant discharged. All concur.

## CONCURRING OPINION.

REYNOLDS, P. J.—I concur in the result but think that State v. Lucas, 94 Mo. App. 117, 67 S. W. 971, cited by Judge GOODE, goes too far in holding it to be no defense that the liquor dealer was enticed into selling illegally, by persons who had been furnished money by citizens for that purpose, so that a sale might be induced and the dealer prosecuted. The true rule, it seems to me, is stated in Grim v. United States, 156 U. S. 604. In that case decoy letters were written by a postoffice inspector, a detective, to one who advertised that he would send information to anyone writing to him, as to where non-mailable obscene publications could be had. The inspector wrote to the advertiser, who mailed him the information. It was contended in defense that as the defendant had been trapped into send-

ing the information, there was no offense. Mr. Justice BREWER, answering this contention, says (l. c. 610): "It does not appear that it was the purpose of the post-office inspector to induce or solicit the commission of a crime, but it was to ascertain whether the defendant was engaged in an unlawful business. . . . The official, suspecting that the defendant was engaged in a business offensive to good morals, sought information directly from him, and the defendant, responding thereto, violated a law of the United States by using the mails to convey such information, and he cannot plead in defense that he would not have violated the law if inquiry had not been made of him by such government official." Citing many authorities, Mr. Justice BREWER includes by illustration the case of one who goes to a house alleged to be kept for illegal gaming, and engages in such gaming himself for the express purpose of appearing as a witness for the government. (Commonwealth v. Baker, 155 Mass. 287), or the purchaser of a lottery ticket who purchases for the purpose of detecting and prosecuting the vendor (People v. Noelke, 94 N. Y. 137), or one who purchases liquor from a suspected violator of the law, to obtain evidence against him (Wharton's note to Bates v. United States, 10 Fed. 92.) These, says Mr. Justice BREWER, are all recognized as lawful means of detecting crime. They are not cases in which the detective induced and urged the commission of a crime, not otherwise intended by the accused. Applying the spirit of these decisions to the facts in the case at bar, I hold that this defendant had no thought whatever of violating any law, had refused to do so, although solicited by the detective, and while the act of a sale to a minor is a violation and an offense, irrespective of any intent on the part of the seller, or knowledge on his part of the age of the ostensible buyer, the sale here made was the direct result of the act of these detectives, in laying a trap for the defendant, into which he fell, in appearance only, violating the law. The principal witness for

the prosecution, young Wein, testified, "I have been engaged for two years in trying to get people to violate the law." A person so acting is *"particeps criminis."* One entrapped by such means should not be held guilty. In brief, I do not think the sale, even if made to the minor, was, under the facts in the case, in violation of the law. Hence, I do not think the conviction should stand, not only for the reason given by my learned brother, but for the reason I have stated above.