THE STATE OF OHIO, APPELLEE, *v.* MICLAU, JR., APPELLANT.*

(No. 23868—Decided February 27, 1957.)

*Mr. John T. Corrigan,* prosecuting attorney, and *Mr. Michael Sweeney,* for appellee.

*Messrs. Siegel & Siegel* and *Mr. Ellis V. Rippner,* for appellant.

KOVACHY, J.   Defendant, Theodore Miclau, Jr., was found guilty of contributing to the delinquency of a female minor child in the Juvenile Court of Cuyahoga County.   He appeals to this court on questions of law.

It appears that two female minor children, Rose Marie McTigue, 15 years old, and Carol Mitman, 13 years old, met in downtown Cleveland on the evening of October 21, 1955.   They ate a meal at the China Lane restaurant and were then joined by another female minor child, Audrey Galomboski, 16 years old, around 8:30 p. m. in front of the Allen Theatre.   According to the testimony of Rose and Carol, the following restaurants were then visited by all three girls:

Clark's, where Audrey had a meal and each drank a beer;

Stouffer's, where each drank a martini;

Black Angus, where each drank a gin with either 7 Up or Squirt;

Pierre's, where one drank a cup of coffee.

Audrey thereafter took a cab home, while Rose and Carol walked to the Central Police Station, a few blocks away, to visit a police newspaper reporter.   The girls found the reporter in his headquarters.   At the time they were noticeably under the influence of intoxicating liquor.   It was near midnight.   The police were called and the girls were interviewed by policewoman Cecelia L. Rogers and lieutenant Norman Bayless.   Up-

*Judgment affirmed, 167 Ohio St., 38.

on information received from the girls, these police officers decided to "set a trap" for the purchase of intoxicating liquor at the places claimed to have been visited by them and the girls were to be used as decoys. Two members of the vice squad were asked to participate in the undertaking. These officers, in turn, communicated with three state liquor agents, who, also, agreed to take part. The girls were told that if they would co-operate, "there would be no court action taken against them." The reporter, although a married man twenty-four years of age, and a mere acquaintance of Rose, agreed to go along. The conspirators drove away from the Central Police Station in three automobiles around 1:30 a. m. With the exception of the Black Angus Restaurant located at East 14th and Euclid, all the restaurants mentioned by the girls were closed. The party, thereupon, descended upon it according to plan, with the exception of Carol who, in the meantime, had become hysterical and had to be left out and was, subsequently, treated by a physician. The men from the vice squad entered the Black Angus first and proceeded to the bar. After five minutes, Rose entered with the reporter. Rose was dressed in a black dress and had on a little black hat with a short veil. She also had a red coat on and wore high heels. The reporter had a marriage ring on one of his fingers. There are two entrances—one to the bar and one to the restaurant. They walked to the one leading to the restaurant, where they were met by the defendant, the night manager. He informed them that the restaurant was closed but, when told by the reporter that they had come to buy a drink, directed them to the bar, where they took seats in a booth. The policewoman followed close by and went directly to a telephone in the bar, from which position she watched the proceedings while talking to police headquarters. The couple was served by a waitress. Rose ordered a gin and Seven-Up, the reporter bourbon and ginger ale. After each was served, the reporter paid for them. The drink furnished Rose was confiscated by one of the men from the vice squad before she drank any of it. It was poured into a sample bottle furnished by the state liquor agents, who entered the bar at the moment the liquor was seized. Despite the promise made to her, Rose was charged in a petition filed in the Ju-

venile Court with being a delinquent child and was found to be such by a judge of that court on November 22, 1955. The defendant herein was charged with contributing to the delinquency of Rose, and was found guilty on January 13, 1956, by the same judge, trial by jury having been waived, the incidents occurring during the execution of the conspiracy being the basis for the charge.

The six assignments of error of the defendant-appellant can be compressed into three:

1. That the trial court erred in finding the manager guilty of the crime of contributing to the delinquency of a minor child since he did not participate in the sale of the intoxicating liquor to her, had no knowledge of the sale, and had previously given express instructions to his employees to guard against sales of intoxicating liquor to minors.

2. That the facts made out a case of entrapment which was a complete defense under the law.

3. Other and numerous errors prejudicial to the rights of the defendant, as appears from the record of the case.

A majority of this court has no difficulty in resolving assignments of error one and two against the defendant.

1. By the weight of authority in states where the law with respect to sales to minors does not require intent or knowledge, a manager of a bar, licensed to sell intoxicating liquor to the public, is criminally responsible for a sale of intoxicating liquor to a minor child by one of his employees, whether or not he personally participates in or has knowledge of such sale, and even though the sale is made contrary to instructions given such employee. The rule is well stated in 15 Ruling Case Law, 358, Section 221, as follows:

"* * * a licensee cannot put his clerks in his shoes, give them the benefit of the license issued to him on the confidence reposed in his moral character, and not be held responsible for their violations of law in the scope of such employment; he cannot set up his bar, receive its profits, and abdicate his duties. The duty is imposed on him that the law shall not be violated by an unlawful sale, and having put it in the power of his agent to sell, the agent acts in the principal's stead and at his peril, and

*the latter cannot therefore escape responsibility because an unlawful sale was made in his absence, and in violation of his express instructions."* (Emphasis supplied.)

*Partridge v. State,* 88 Ark., 267, 114 S. W., 215; *State v. Pigg,* 78 Kan., 618, 97 P., 859; *State v. Anderson,* 127 La., 1041, 54 So., 344; *State v. Gilmore,* 80 Vt., 514, 68 A., 658; *State v. Constatine,* 43 Wash., 102, 86 P., 384; *State v. Nichols,* 67 W. Va., 659, 69 S. E., 304; *State v. Kittelle,* 110 N. C., 560, 15 S. E., 103; 115 A. L. R., 1230; 30 American Jurisprudence, 414 and 424; *State v. Kominis,* 73 Ohio App., 204, 55 N. E. (2d), 344; *State v. Davis,* 95 Ohio App., 23, 117 N. E. (2d), 55.

The case of *Anderson v. State,* 22 Ohio St., 305, has come to our attention. The syllabus reads:

"1. Where, in a prosecution for unlawfully selling intoxicating liquor, it appears by the evidence for the state, that the sale was made by the agent of the defendant in charge of the establishment where the liquor was sold, it is competent for the defendant to rebut the presumption of *prima facie* agency, which the evidence makes against him, by showing that the sale was, in fact, made without his authority and against his directions."

The laws dealing with intoxicating liquor in the state of Ohio have undergone much change since that case was decided 85 years ago. Under modern concepts, licensees, who take the full benefits of the privileges given them, are held strictly accountable for the conduct of their business in keeping with law. It would be contrary to the public interest to permit such licensee to escape liability for violation of law by an employee directly under his control and acting within the scope of his authority when selling intoxicating liquor to a minor child under a statute that does not include the element of intent or knowledge.

And so, where a minor child, by reason of such sale, is found to be a delinquent child by a Juvenile Court, as here, it necessarily must follow that the manager is amenable to prosecution for "contributing to the delinquency" of such minor child. *State v. Sobelman,* 199 Minn., 232, 271 N. W., 484.

2. The law in Ohio with respect to entrapment follows the majority rule. Where a sale of intoxicating liquor in violation of law is made in the regular course of business without the

thought of the violation being implanted in the mind of the accused by some person, there is no entrapment. Entrapment, thus, is where a person is induced to commit a crime he did not intend to commit and which he would not have committed but for some artifice, spoken or acted. In other words, it is *not* entrapment merely to give the person the opportunity to violate the law; it *is* entrapment to induce a person to commit a crime which he would not have committed except for the affirmative prodding on the part of the entrapper for the purpose of securing a conviction of the one entrapped. In *Langdon* v. *Board of Liquor Control,* 98 Ohio App., 535, 130 N. E. (2d), 430, it is written on page 537, quoting from 18 A. L. R., 146, and found in 12 Ohio Jurisprudence, 80, Section 38:

"Where the doing of a particular act is a crime regardless of the consent of anyone, the courts are agreed that if the criminal intent originates in the mind of the accused, and the criminal offense is completed, the fact that an opportunity is furnished, or that the accused is aided in the commission of crime in order to secure the evidence necessary to prosecute him therefor, constitutes no defense."

See, also, *Davis* v. *State,* 26 Ohio App., 340, 159 N. E., 575; *Sorgen* v. *State,* 36 Ohio App., 281, 172 N. E., 835; *State* v. *Henning,* 83 Ohio App., 445, 78 N. E. (2d), 588; *State* v. *Gutilla,* 94 Ohio App., 469, 116 N. E. (2d), 208; *State* v. *McCornish,* 59 Utah, 58, 201 P., 637; *State* v. *Feldman,* 150 Mo. App., 120, 129 S. W., 998.

The writer of this opinion is of the belief that a question arises which, though not directly raised by the defendant, comes within the purview of assignment of error No. 3, and transcends all other considerations in the case.

I consider it reprehensible for law enforcement officers to impel a fifteen-year-old girl to enter a public bar, as a decoy, at 1:30 o'clock in the morning, in the company of a married man, for the express purpose of buying intoxicating liquor, in violation of the criminal laws of the state of Ohio.

By these tactics they (1) made her amenable to a charge of being a delinquent child; (2) transgressed common decency by acting without the consent of her parents; (3) flouted the crimi-

nal laws that they had sworn to uphold by violating Section 2151.41, Revised Code, prohibiting the abuse, abetting or contributing to the delinquency of a child; and (4) disregarded Section 2151.40, Revised Code, requiring municipal departments and officials to "render all assistance and co-operation" to further the objects of the Juvenile Court Act.

Section 4301.63, Revised Code, reads:

"No minor under the age of 21 years shall purchase intoxicating liquor, nor shall a minor under the age of 18 years purchase beer."

Section 2151.02, Revised Code, provides:

"As used in Sections 2151.01 to 2151.54, inclusive, of the Revised Code, 'delinquent child' includes any child:

"(A) Who violates any law of this state, the United States, or any ordinance or regulation of a subdivision of the state."

Section 2151.41, Revised Code, provides:

"No person shall abuse a child or aid, abet, induce, cause, encourage, or contribute to the dependency, neglect, or delinquency of a child or a ward of the Juvenile Court, or act in a way tending to cause delinquency in such child. * * *"

The state of Ohio is in the forefront among the states of this country in the enactment of progressive, humanitarian and benevolent laws for the protection of its children. The object of these laws is to help keep children away from improper influences and harmful environment during their formative years. The state has gone to great lengths to establish institutions at high cost to the taxpayers in order to do everything known to the social sciences to give the weak and immature child a fair fighting chance to develop into an honest, sober and virtuous person so necessary for good citizenship. In passing these laws, the Legislature had the welfare of *each child* in mind. It is stated in *Travis* v. *State*, 12 C. C. (N. S.), 374, at page 376, 21 C. D., 492, 494:

"It is not the purpose of the act to punish the child, but to take it out of environments, which if continued would result disastrously to it as well as to society, and thereby create a standing menace to the state; and to supply it with opportunities for good moral training and physical comforts and support."

In 23 Harvard Law Review, pages 109 and 110:

"To get away from the notion that the child is to be dealt with as a criminal; to save it from the brand of criminality, the brand that sticks to it for life; to take it in hand and instead of first stigmatizing and then reforming it, to protect it from the stigma—this is the work which is now being accomplished by dealing even with most of the delinquent children through the court that represents the *parens patriae* power of the state * * *"

"Every statute which is designed to give protection, care, and training to children, as a needed substitute for parental authority, and performance of parental duty, is but a recognition of the duty of the state, as the legitimate guardian and protector of children where other guardianship fails."

To carry out this philosophy for the benefit of all children, the county of Cuyahoga has built an expensive and modern Juvenile Court building and provided for two juvenile judges, a corps of probation officers, psychologists and attendants to carry out this worthy purpose. Under their program, each child is considered valuable and precious to the community and each child gets individual attention commensurate with the circumstances attaching.

In the case of *In re Konneker,* 30 Ohio App., 502, 510, 165 N. E., 850, it is said:

"The laws governing said courts were passed to conserve and protect the child life of our state."

And at page 549 of 24 Ohio Jurisprudence, it is stated:

"Under it, the state, which through its appropriate organs is the guardian of the children within its borders, assumes the custody of the child, imposes wholesome restraints, and performs parental duties, at a time when the child is not entitled either by the laws of nature or of the state to absolute freedom, but is subjected to the restraint and custody of a natural or legally constituted guardian to whom it owes obedience and subjection."

What Rose Marie McTigue most needed, when accosted by the policewoman at midnight in Central Police Station, while under the influence of intoxicating liquor, was benevolent and helpful attention and direction. She was a young and immature person, plainly lacking parental discipline and control. But in-

stead of such consideration, she was used as the tool of police officers zealous to procure ironclad evidence of violation of law and who were wholly oblivious of the indignities heaped upon her person and the possible consequent jeopardy of her reputation as a proper and decent young girl.

Charles Lamb, in his essay on Love, Death and Reputation, said this:

"Reputation said: 'If once we sever,
Our chance of future meeting is but vain:
Who parts from me, must look to part forever,
For Reputation lost comes not again.' "

Yet all that was expected of them, as conscientious guardians of the law, was to investigate thoroughly the statements and charges made by these girls, and to take action appropriate to the facts disclosed.

That these officers acted in good faith there can be no doubt. In my opinion, however, they acted under a mistaken sense of duty and not only perpetrated an injustice upon Rose Marie McTigue but engaged in an undertaking inimical to public morals and public welfare, and, consequently, contrary to public policy. In *Kintz* v. *Harriger*, 99 Ohio St., 240, 124 N. E., 168, the Supreme Court of Ohio in an opinion concurred in by all the judges voting, one judge not participating, said on page 246:

"In substance, it [public policy] may be generally said to be the community common sense and common conscience extended and applied throughout the state to matters of public morals, public health, public safety, public welfare, and the like. It is that general and well-settled public opinion relating to man's plain, palpable duty to his fellow man, that has due regard to all circumstances of each particular situation."

Again, the Supreme Court of Ohio stated in *Pittsburgh, C., C. & St. L. Ry. Co.* v. *Kinney,* 95 Ohio St., 64, 115 N. E., 505, in paragraph 2 of the syllabus:

"2. The public welfare is safeguarded not only by constitutions, statutes and judicial decisions, but by sound and substantial public policies underlying all of them."

And at page 68:

"When a course of conduct is cruel or shocking to the average man's conception of justice, such course of conduct must be

held to be obviously contrary to public policy, though such policy has never been so written in the bond, whether it be constitution, statute or decree of court."

An undertaking contrary to public policy is illegal, and if engaged in for the purpose of gathering proof of a violation of law, testimony with respect to it at the trial of the person charged with the crime should be rejected on the court's own motion; for to indulge it would make the court a party to the invalid transaction, which a court of law will never do. This is the course the Juvenile Court should have pursued under the facts and circumstances of this case since it is the court enjoined by law to carry out all provisions of law concerning children, and, when so acting it "represents the *parens patriae* power of the state." (*Supra.*) The admission of this tainted evidence in the trial of the case, it seems to me, was reversible error per se.

A court's power to act *sua sponte* when circumstances warrant is illustrated in the following cases:

(1) *Pape* v. *Standard Oil Co.,* 5 C. C. (N. S.), 252, 17 C. D., 111 (syllabus):

"A contract by the terms of which the parties undertake to deceive and defraud the public is not enforceable, and where the defendant does not plead the objection, a court will refuse upon its own motion to entertain an action founded thereon."

(2) *Strader* v. *United States,* 72 F. (2d), 589 (headnote 5):

"5. Proof of entrapment into committing crime requires termination of prosecution therefor, as conviction on proof so obtained is against public policy."

And on page 591 the court said:

"Such a question may be investigated on the court's own motion at any stage of the proceedings because proof of its existence requires that the prosecution be ended, as it is against public policy to convict one upon proof obtained in that manner * * * "

The same principle of law applies to the facts in this case.

I am aware of the case of *State* v. *Lindway,* 131 Ohio St., 166, 2 N. E. (2d), 490, and the many Court of Appeals cases following its mandate. They establish the proposition that evidence illegally obtained can be used in the prosecution of a crime if otherwise competent, relevant and material. I am also

acquainted with the very able dissertation on the subject by Professor John H. Wigmore found in the "Lawyers Treasury," page 433, under the title "Using Evidence Obtained By Legal Search and Seizure." The admissibility of evidence in all these cases was challenged on the ground that a personal right of the defendant had been violated in obtaining the evidence.

No such consideration obtains with respect to the evidence here discussed. Rather, my concern is the right of police officers to use a minor child in their pursuit of detecting crime under circumstances that are shocking to the conscience of a self-respecting community and which disregard protections evolved for the child by law and custom. That is a totally different matter.

Section 2151.40, Revised Code, styled "Co-operation required" reads in part:

"Every county, township, or municipal official or department, including the prosecuting attorney, shall render all assistance and co-operation within his jurisdictional power which may further the objects of Sections 2151.01 to 2151.54, inclusive, of the Revised Code. * * * The court may seek the co-operation of all societies or organizations having for their object the protection or aid of children."

Police officers of a city are agents of the state and employees of a department of a municipality. They are required by law to "further the objects" of the Juvenile Court Act by throwing a protective arm around every minor child coming under their jurisdiction.

It seems clear to me, therefore, that the doctrine enunciated in the case of State v. Lindway, supra, has no application to this case. In the Lindway case, the evidence itself was in no way impugned. It was valid and in every way desirable as proof for the purposes to be subserved. Here, however, the evidence itself was invalid and its admissibility vitiated, it being created contrary to public policy.

The Supreme Court in State v. Lindway, supra, recognized the overriding power of public policy when it is said, on page 181:

"Of course, if the state of Ohio should ever deem it expedient as a matter of public policy to declare that evidence wrong-

fully seized can not be used against a *defendant in a criminal case on the basis that its admission encourages the lawless acts of over-zealous officers of the law in their methods of obtaining evidence, that would be an entirely different matter which is not our concern here. People v. Mayen* [188 Cal., 237], *supra.*" (Emphasis supplied.)

I hold, accordingly, that the evidence of a sale of liquor to the minor child involved in this case in the early morning of October 22, 1954, in the Black Angus Restaurant was inadmissible per se because of the means employed in obtaining the same and that, as a consequence, the trial court committed reversible error prejudicial to the rights of the defendant in considering such evidence on the charge of contributing to the delinquency of a minor brought against him. As a result thereof, the degree of proof necessary to a conviction in a criminal case was lacking and the judgment of the trial court, as a matter of law, erroneous. Since another member of this court concurs in a judgment of reversal and for final judgment for the defendant, the judgment of the Juvenile Court therefore is reversed and we proceed to enter the judgment which the Juvenile Court should have rendered and discharge the defendant.

Judgment reversed and final judgment for defendant.

*Judgment reversed.*

HURD, J., concurs in the judgment.
SKEEL, J., dissents.

HURD, J. (Concurs only in judgment of reversal and order of discharge but for entirely different reasons.) I concur in the judgment of reversal and in the order discharging the defendant. In my opinion, the facts and circumstances disclosed by the evidence are such that the motion made for a discharge of the defendant at the close of the state's case should have been granted and failing that, the motion at the close of the entire case should have been granted on the ground that there is no evidence in the record to substantiate the charge that the defendant was guilty of the crime of contributing to the delinquency of a minor.

Theodore Miclau, Jr., the defendant, was charged with contributing to the delinquency of one Rose Marie McTigue, a minor, ''in this, to wit: that on or about the 21st day of October, 1955, in Cuyahoga County, Ohio, he, the said Ted Miclau, Jr., being an adult male person and the manager of the Black Angus Restaurant and Lounge Bar, located at 1326 Huron Road, Cleveland, Ohio, *did unlawfully through his agent and employee one Bernice Vassallo, a female adult person and a waitress* at the aforesaid Black Angus Restaurant and Lounge Bar, sell intoxicating liquor to the said Rose Marie McTigue, a female child, 15 years of age.'' (Emphasis added.)

The evidence adduced by which it is intended to show the defendant acted unlawfully through his agent and employee relates only to an incident which occurred at or about 1:30 in the morning of October 22, 1955, when, according to the testimony of policewoman Rogers and police officer Faitz, they, the said officers, ''set a trap,'' for the purpose of inducing a violation of the liquor laws of the state of Ohio.

To accomplish this purpose, they used the minor, Rose Marie McTigue, as a decoy and arranged to have her escorted by an adult married man nine years her senior in age. The escort, Gerald Rouby, a police reporter for a Cleveland newspaper, was at that time stationed on night duty at the Cleveland Central Police Station. According to the testimony of the minor, she had known the reporter, whom she called ''Jerry,'' for a little over a year and had been in the habit of visiting with him occasionally at night at his office at the police station. She testified also that she knew the ''police officers around there''; she said that when she went to the police station to visit with ''Jerry'' and the police officers, they would ''talk about stories that were in the papers.''

The evidence in the record shows that late on the night of October 21st, a plan was hurriedly evolved by the police officers with the co-operation of the newspaper reporter, whereby they would attempt to entrap someone into serving a drink of intoxicating liquor to the minor. The evidence shows also that the minor was completely under the control and direction of the police officers and that in all respects she obediently complied with their instructions at the time and place in question. The

police procured the co-operation of the minor by making a promise to her that if she co-operated with them in their plan, she would not be prosecuted as a delinquent child, to use her words, she "would not be sent away," and that "they would help her."

In order to carry their plan into effect and to gain entrance to the restaurant, they arranged that the reporter should pose as the escort of the minor. The minor was dressed in a nylon black dress, wore high heels and nylon stockings and a hat with a veil on it. She had previously told the police that she and two other juveniles, similarly dressed, had succeeded earlier the same evening in procuring intoxicating liquor at two well known Cleveland restaurants located on Euclid Avenue, namely, Clark's and Stouffer's Restaurants and at the Black Angus, located at 1326 Huron Road, all of which occurred prior to the incident upon which this defendant was charged.

Policewoman Rogers testified that she "had intended to have both girls (Rose Marie McTigue and Carol Mitman), go in, but after leaving the police station, Carol became, well, almost hysterical and I knew that it was impossible to have taken her into the place." Policewoman Rogers testified in answer to a question, that she did not include the names of Clarks and Stouffers in her affidavit "because the places were closed. Had we gone back there another day, it would have been entrapment and we would not be a part to any entrapments." She was also asked "What would you call this?" and she answered "Setting a trap, but certainly not entrapment."

As to the promise made to the girls, including Rose Marie McTigue, she testified: "I made a promise to those girls that if they would co-operate with us to get the one responsible * * * there would be no court action taken against them." She was also asked: "Did you have the right to do that?" and she answered "Yes, I have the right," and further testified: "If a person co-operates, we have made those promises many, many times and it is done."

Andrew Faitz, another police officer who was a witness for the state, testified that promises were made to these girls, although he did not himself make them. He testified also, in answer to a question, that "they had set a trap" in this case. He

testified further that Clark's, Stouffer's and the Black Angus Restaurants were "high calibre" restaurants and that he would place them all in the same classification.

The testimony of the defendant stands uncontradicted in the record that the waitress, Bernice Vassallo, had been specifically instructed by him that no intoxicating liquor should ever be sold or served to minors. Theodore Miclau, Sr., the father of the defendant and the owner of this and another restaurant where intoxicating liquors are sold, also testified that specific orders and instructions were given to all his employees that no intoxicating liquors were to be served or sold to minors or teen-agers. His testimony also stands uncontradicted.

It was stipulated by counsel that if the records of the Municipal Court would be introduced in evidence, such records would show that the waitress, Bernice Vassallo, had been arrested, tried and convicted in the Municipal Court of Cleveland on a charge of selling intoxicating liquor to the minor, Rose Marie McTigue.

In pursuance of the plan agreed upon, the detectives and the policewoman entered the Black Angus first. Then Jerry Rouby and Rose Marie McTigue entered and proceeded into the bar and sat in a booth about midway into the bar and ordered drinks which were paid for by Rouby. After the drinks were served, the officers immediately confiscated the drink served to Rose and placed it in a container for evidence. This was done in accordance with their plan. Thereafter this action was brought against the defendant, who was adjudged guilty of contributing to the delinquency of the minor. From this judgment, appeal was prosecuted to this court.

Section 2151.41, Revised Code (Section 1639-45, General Code), entitled, "Prohibition against abuse of or abetting delinquency of child," so far as it is pertinent, provides as follows:

"No person shall *abuse a child or aid, abet, induce, cause, encourage, or contribute to the dependency, neglect, or delinquency of a child or a ward* of the Juvenile Court, or act in a way tending to cause delinquency in such child." (Emphasis added.)

Section 2151.41, Revised Code, contains three elements of "contributing." The first two relate to dependency and neglect

which are not involved in this case. The third relates to delinquency which is here involved. The first two peculiarly involve the relationship of parent and child or those standing in "loco parentis." These elements are negative in character and connote a failure upon the part of parents to provide properly for their children. The third element of delinquency, so far as parents are concerned, can be either negative or positive in character. But as to third persons having no relationship to the child, all Ohio cases indicate some affirmative or positive action is necessary to support a charge of contributing to the delinquency of the child as defined in Section 2151.02, Revised Code.

The term delinquent child is defined by Section 2151.02, Revised Code, former Section 1639-2, General Code. So far as is pertinent, this section reads:

"As used in Sections 2151.01 to 2151.54, inclusive, of the Revised Code, 'delinquent child' includes any child:

"(A) Who violates any law of this state, the United States, or any ordinance or regulation of a subdivision of the state;
"* * *

"(D) Who so deports himself as to injure or endanger the morals or health of himself or others;
"* * * "

The crime of contributing to the delinquency of a child is a very serious offense which casts upon the state the burden of proving each essential allegation of the crime charged, by evidence beyond a reasonable doubt, the defendant at the outset of the trial, as in all criminal cases, being clothed with the presumption of innocence.

From the facts above stated, it is clear that the defendant did not personally either sell or serve the minor with intoxicating liquor, nor is it charged that he did. The charge of criminality is predicated solely upon the conduct of "an agent and employee." It is not charged that he had any knowledge of the incident when it occurred. There is a complete lack of any evidence showing or tending to show personal participation, culpability or complicity upon his part. Neither is there any evidence showing or tending to show any conspiracy upon his part, nor is it so charged in the affidavit. The evidence is directly to the contrary as all instructions and directions to the

waitress involved, and to all other employees were that they were not to sell or serve minors or teen-agers intoxicating liquors.

From the evidence adduced upon trial, it must be concluded that the minor, when accompanied by the police reporter, and acting entirely in obedience to the instructions of the police-woman and other officers, and according to their plan, did not commit any act of delinquency. She did not consume any liquor purchased for her by the police reporter nor was it intended or planned that she should do so. The liquor served was immediately confiscated by the police officers and preserved as evidence, all in accordance with the preconceived plan. It follows as a necessary corollary that if the minor was not guilty of any delinquency in accompanying the officers and acting under and in accordance with their instructions, then the defendant could not have contributed to a delinquency which did not then and there take place. Support for this conclusion is found in many Ohio cases. For example, in *State* v. *Hawkins,* 56 W. L. B., 166, the second paragraph of the syllabus provides:

"2. Delinquency for which a minor under seventeen years may be prosecuted must be an existing condition, to which all persons aiding, abetting or contributing may be held amenable under General Code 1654, there being no limitation on account of age, sex or moral condition."

In that case, at page 167, Brister, J., instructed the jury, in part, as follows:

"Now, to contribute to anything, as I understand it, is to add to it; and there must be an existing thing, before you can contribute to it. That is, there must be already a delinquent state, or delinquent condition of the minor, to which the party charged adds and contributes more."

In *State* v. *Clark,* 92 Ohio App., 382, 110 N. E. (2d), 433 (motion to certify overruled June 18, 1952), where the defendant was directly involved with a minor on a charge of contributing to his delinquency, the Court of Appeals for Huron County said as appears by the second and fourth paragraphs of the syllabus:

"2. Insofar as Section 1639-45, General Code, condemns aiding, abetting, causing, encouraging, or contributing towards the delinquency of a child, it contemplates an existing delin-

quency and in such instance it is required that the complaint allege and the proof establish that the minor is or was a delinquent and that such delinquency was in some measure caused or contributed to by the accused."

"4. In reviewing a case on the weight of the evidence, the Court of Appeals must determine whether the evidence attains that high degree of probative force and certainty which the law demands to support a conviction."

In that case, the judgment of the Juvenile Court was reversed and the accused discharged.

For other authoritative Ohio Appellate Court decisions to the same effect, see:

*Edmonds* v. *State*, 30 Ohio App., 195, 164 N. E., 649; *State* v. *Zaras*, 81 Ohio App., 152, 78 N. E. (2d), 74; *State* v. *Kiessling*, 93 Ohio App., 524, 114 N. E. (2d), 154.

Consequently, since there is no evidence that the minor committed an act of delinquency when she was acting completely in obedience to the directions and instructions of the police and under their exclusive direction and supervision, on the basis of logic and reason, sustained by authoritative Ohio cases, the defendant could not have been guilty of the crime charged and his motion at the close of the state's case should have been allowed and defendant discharged. This determination is, we think, decisive of this appeal.

However, because the assignments of error raise other issues which have been considered by the other members of the court, I consider it necessary to proceed to a consideration of another question which involves agency, that is the charge that the defendant was guilty of contributing to the delinquency of a minor in that he "*did unlawfully, through his agent and employee * * * a waitress, sell intoxicating liquor* to a female child 15 years of age." (Emphasis added.)

It is held generally by Ohio text authorities and by Ohio cases that the relationship of principal and agent is not recognized in the commission of criminal offenses. In 2 Ohio Jurisprudence (2d), 244, Agency, Section 172, we find the following:

"Strictly speaking, the legal relation of principal and agent does not exist in regard to the commission of criminal offenses. The law of agency as applied to civil cases has no application in

criminal prosecutions. The criminal law does not recognize the doctrine of agency as a defense to a criminal charge, therefore, a principal is not liable for the criminal act of an agent unless he in some way participates in, countenances, or approves of what the agent does, or otherwise stated, unless he counsels, commands, aids, abets, or procures the commission of the act. And even though one who procures another to commit a crime, or participates with the agent in the commission thereof, is criminally liable, responsibility does not rest upon the principle of the law of agency; all who participate in crimes are either principals or accessories.''

To the same effect, see 15 Ohio Jurisprudence (2d), 289, Criminal Law, Section 58, under the title of Principal and Agent.

The leading case in Ohio upon this subject is *Anderson* v. *State,* 22 Ohio St., 305, decided 1872, the first and second paragraphs of the syllabus of which provide as follows:

''1. Where, in a prosecution for unlawfully selling intoxicating liquor, it appears by the evidence for the state, that the sale was made by the agent of the defendant in charge of the establishment where the liquor was sold, it is competent for the defendant to rebut the presumption of *prima facie* agency, which the evidence makes against him, by showing that the sale was, in fact, made without his authority and against his directions.

''2. But the directions to the agent, forbidding the sale, must be in good faith; for, however notorious or formal they may be, they can have no effect, if they are merely colorable. The fact of agency is to be determined by the *real understanding* between the principal and agent.''

At the time the decision in the case of *Anderson* v. *State* was rendered, there was in effect a statute enacted by the Legislature, May 1, 1854 (52 Ohio Laws, 153), which provided as follows:

''That it shall be unlawful for any person or persons, by *agent or otherwise,* to sell intoxicating liquor to minors * * *.''
Subsequent to this decision, however, the statute was repealed (74 Ohio Laws, 300) and was re-enacted (74 Ohio Laws, 268) and the phrase, *''by agent or otherwise,''* was omitted. The code provision in effect since 1953 is the present Section 4301.69, Revised Code. It reads as follows:

"*No person* shall sell intoxicating liquor to a person under the age of twenty-one years or sell beer to a person under the age of eighteen, or buy intoxicating liquor for, or furnish it to, a minor, unless given by a physician in the regular line of his practice, or by a parent or legal guardian." (Emphasis added.)

From this, it will be observed that the guilt is personal rather than vicarious. Consequently, the statement of the Supreme Court in *Anderson* v. *State, supra,* at page 308, has much greater significance when read in the light of the present statute. At page 308, the court said:

"All who participate in the commission of such offense, are either principals or accessories. In offenses less than felony all are principals. *But when it in fact appears that the person accused in no way participated in the commission of the criminal act, he ought not, by construction, to be made punishable for it.*" (Emphasis added.)

In a careful examination of later cases, decided by the Supreme Court, we find that *Anderson* v. *State, supra,* has never been reversed or modified and we must assume that it is the law of the state until such time as the Supreme Court modifies or disapproves that case. Therefore, the dictum of the Supreme Court in that case is still binding upon this court. As late as July 5, 1950, in *Miller* v. *Wick Bldg. Co.,* 154 Ohio St., 93, 93 N. E. (2d), 467, Judge Taft, speaking for a unanimous court in a civil case, at page 100, twice cited *Anderson* v. *State* with approval.

In Volume 139 A. L. R., at page 317, the case of *Anderson* v. *State, supra,* is cited, together with many other cases, for the proposition that "it has been accepted as the rule that an employer is not criminally liable for an unlawful sale of intoxicating liquor by his employee, where such sale was made in violation of the instructions of the defendant."

In *Mignery* v. *State,* 10 Ohio App., 232, 29 C. C. (N. S.), 534, the court, at page 236, stated:

"Evidence was introduced on behalf of the defendant showing that he had on various occasions given his bartenders directions not to sell liquor to minors. If the prosecution were for unlawfully selling intoxicating liquor it would be competent for the defendant to prove that he had given in good faith directions

to his bartenders forbidding sales to minors, as was held in *Anderson* v. *State,* 22 Ohio St., 305.''

In *Harris* v. *State,* 1 Ohio App., 323, 20 C. C. (N. S.), 356, 24 C. D., 187, the Court of Appeals for Stark County held that an instruction to the jury was correct which stated in part as follows:

''I desire to say to you further, that if you find from the evidence in the case that the liquor was furnished without his authority and against his instructions given in good faith, that he could not be convicted of the offense with which he stands charged in the indictment.''

In the instant case, there is no evidence showing or tending to show that the defendant participated in any way in the sale of the liquor to the minor. It was done out of his presence and without his knowledge. The evidence is uncontradicted that the sale by the agent was in violation of his instructions not to sell to minors and there was no evidence introduced by the state in its case in chief or rebuttal to show that the instructions of the proprietor and manager were colorable only or that the same were not given in good faith.

Therefore, if liquor was sold to the minor by an agent and employee of defendant without his knowledge, consent or participation, the defendant is not guilty of contributing to the delinquency of the minor in view of the provisions of the Ohio Code now in effect. Considering the unusual facts and circumstances of the instant case, a finding of guilty due to the acts of an agent and employee, mistaken or otherwise, contrary to instructions, should not be sustained by this court. As stated by the Supreme Court in *Anderson* v. *State, supra,* the accused, who did not participate in the commission of the criminal act, ''ought not, by construction, to be made punishable for it.''

Furthermore, it is highly important to distinguish between a violation of the laws respecting the regulation and sale of intoxicating liquor by permittees and the crime of contributing to the delinquency of a minor.

The operator or owner of an establishment where liquor is sold holds his license subject to compliance with the laws regulating the sale of intoxicating liquor under penalty of suspension or revocation of his license. This, however, would involve civil

procedures under the provisions of the Liquor Control Act and is a far different proceeding from the criminal charge of contributing to the delinquency of a minor.

Even in this class of cases which is civil in character, involving proceedings before the Board of Liquor Control to revoke or suspend a liquor license, knowledge of the unlawful sale by an employee or agent of the permittee has been held to be a prerequisite to suspension or revocation of a permit. See *Sata* v. *Board of Liquor Control*, 88 Ohio App., 88, 94 N. E. (2d), 464. See, also, *Knoff* v. *Board of Liquor Control*, 61 Ohio Law Abs., 563, 105 N. E. (2d), 673, which is to the same effect.

Although those cases concern a review of the appropriateness of an order of the Board of Liquor Control suspending a liquor permit, the language of the court is significant for it stresses the importance of knowledge, actual or constructive, on the part of the party charged with the violation. Thus, if in a case where the issue is the suspension of a liquor permit for a limited time only, it is necessary to show that the party charged with the violation had knowledge of the same, how much more important is it in a criminal prosecution where the law is to be construed strictly in favor of the accused that it be incumbent upon the state to prove as an element of the crime charged that the party being tried had some knowledge thereof or participated therein? Certainly, except for a few well-delineated exceptions, knowledge thereof is a requisite of any criminal offense. I do not believe that the case under consideration can be or should be fitted into the narrow category of that exception.

An examination of the cases where the defendant has been held guilty of contributing to the delinquency of minors in violation of the Liquor Control Act relates to cases where the defendant was personally guilty of affirmative and positive action in the sale. In the instant case, the defendant is sought to be held for the mistake or misconduct of an employee in violation of his orders.

Thus in *State* v. *Kominis*, 73 Ohio App., 204, 55 N. E. (2d), 344, the evidence shows that defendant was charged with aiding, abetting, and inducing the delinquency of a fifteen year old boy in that he furnished the child with intoxicating liquor "causing his intoxication." There the testimony in the record was to the

effect that the defendant himself sold whiskey to the child and while there was some testimony countering the evidence, the trier of the facts found the defendant guilty. There was no question of sale by an agent in that case without the knowledge of the defendant.

In the case of *State* v. *Davis*, 95 Ohio App., 23, 117 N. E. (2d), 55, a defendant was found guilty of contributing to the delinquency of a minor. The facts in that case show that the parent of the boy and the defendant, Davis, engaged in a conspiracy to carry on a lottery known as "numbers" or policy in violation of law. The holding of this court in that case was simply that ignorance of the minority of the child, on the part of the defendant, Davis, was not a defense. No analogy can be drawn between that case and the instant case.

The case of *State* v. *Butler*, 38 Ohio Law Abs., 211, decided by the Juvenile Court of Tuscarawas County, April 8, 1943, cited in the dissenting opinion, must also be distinguished from the instant case. In that case, a mother of a fifteen year old son left him in her place of business where intoxicating liquor was sold from 11:30 p. m. until 12:00 and instructed him to watch the bartender. In the short space of time that her son was in the bar, he served three glasses of whiskey, and two minors and one adult consumed the whiskey served by him. Here it is quite apparent that the relationship of mother and son had a distinct bearing upon the guilt of the mother who, by her affirmative act, placed the son in her bar room under circumstances which clearly showed that she was thereby contributing to his delinquency. However, even in that case, the court said at page 212:

"The defendant excuses herself in this action by stating that she always instructed her son never to wait on any customers. Such an instruction if met in good faith, with proper supervision of the son, would be a good defense to this action, *because the furnishing of liquor in violation of law by an agent without authority and against the instruction of the principal absolves the principal from wrongdoing.*" (Emphasis added.)

The circumstances of the instant case are so peculiar that citation of text authorities of other jurisdictions and decided cases of other jurisdictions are not helpful and certainly can form no predicate for an affirmation of guilt in this case. We

are governed here entirely by Ohio law, both statutory and case law. Consequently, the affidavit upon which the accused was charged with crime through an agent is fatally defective. Furthermore, under the facts and circumstances shown in the evidence, the defendant cannot be held to be guilty of a crime because of the mistake or even misconduct of another concerning which he had no knowledge and in which he had no participation.

A reading of the record of this case from cover to cover fails to show any evidence that the defendant by agent or otherwise, aided, abetted, induced, caused, encouraged or contributed toward the delinquency of the minor as charged in the affidavit. For these reasons, the judgment of the trial court should be reversed and this court, proceeding to do what should have been done by the trial court, should order the defendant discharged.

Skeel, P. J., dissenting. I am unable to concur in the reversal of the judgment in this case and particularly with the entry of final judgment. An extensive review of the evidence, as well as a research of the law, is necessary to a proper understanding of the case.

On October 21, 1955, the defendant was the night manager of the "Black Angus" Restaurant and Lounge Bar where intoxicating liquors are sold, located on Huron Road in downtown Cleveland. It is charged that on that date the defendant contributed to the delinquency of Rose Marie McTigue, a minor of the age of fifteen years, in that he permitted intoxicating liquors to be sold to her by a waitress employed in said restaurant and bar, making the sale in the regular course of her employment.

The first witness testified to the charges filed against Rose Marie McTigue and the fact that by reason of the events of the evening of October 21 and the early morning of October 22, 1955, she was found to be a delinquent child by the Juvenile Court of Cuyahoga County.

Rose Marie McTigue testified that at about 10 p. m. of October 21, she met her girl friend, Audrey Galomboski, age sixteen, in front of a movie house (the Allen Theatre) on Euclid Avenue. She was with Carol Mitman, age thirteen. The three girls went to Clark's Restaurant, located in Playhouse Square

where Audrey ordered a dinner and a beer and Rose and Carol had a beer. From Clarks, the three girls went to Stouffers where they ordered, and each was served a "martini." From Stouffers, they went to the Black Angus where they ordered and each was served "gin and it was either seven-up or squirt." From the Black Angus, they went to Pierre's Restaurant and Bar in the vicinity, where they were refused intoxicating drinks but were offered black coffee. Audrey Galomboski was then put in a taxicab and sent home while Rose and Carol went to the Central Police Station to visit Jerry Rouby, a police station newspaper reporter. It was then about eleven thirty or fifteen minutes to twelve.

Carol Mitman testified that on the evening of October 21, 1955, she and Rose Marie McTigue went to China Lane to eat. They then met Audrey Galomboski in front of the Allen Theatre at about 8:30 p. m. They went to Clark's Restaurant where "Audrey ate and we all had beer * * *." They then went to Stouffers and "we had a martini." She testified she had never had a martini or any other intoxicating liquor before. They then went to the Black Angus. There they ordered "gin and squirt." From there they went to Pierres. It was then about 10:30 p. m. In describing their conduct at Pierres, she testified: "We tried to get served and they said they won't serve us anything but coffee." She testified also that when they left Pierres, they "put Audrey in a cab."

On cross-examination, Carol Mitman testified:

"Q. You said you never had any drinks before? A. Yes.

"Q. Never? A. Never.

"Q. How did you know the difference between a gin, how did you know to call these drinks the way you had, a gin and a squirt, tell the court how you arrived at these names? A. They were on a card."

Carol testified that, after putting Audrey in a cab, she and Rose walked to the police station. There they talked to Jerry Rouby, a newspaper reporter with whom they were acquainted, then with a policewoman, Cecelia Rogers, and other police personnel.

The newspaper reporter testified that the girls got to his office in central police station about 11:30 p. m. and that he

called the police to talk to the girls. At one point of his testimony (on cross-examination), in referring to what the girls had been doing at Clarks, Stouffers and the Black Angus, he testified:

"Q. What had they been doing there? A. I don't know.

"Q. You don't know what they were doing there but you went? A. I can presume but I don't know.

"Q. You don't know. What did you presume? A. I presume they had been drinking.

"Q. How did you know, did the girls appear that they had been drinking? A. Yes."

There can be no question from the record that the police were called by this witness because of the girls' story of the night's adventures and because of their condition of being affected by drinking intoxicating liquor which, in fact, gave complete veracity to their story. The police also testified that the girls appeared to have been drinking and that Carol (later that night) needed to be attended by a doctor.

After the police (Cecelia L. Rogers and lieutenant Bayless), along with Rouby, talked with the girls and waited for members of the detective bureau (the vice squad and liquor men) to come, they took the girls, with the reporter, back to the Black Angus (the other restaurants the girls had visited being closed, it then being about 1:30 a. m.). The witness, Rouby, went into the Black Angus with Rose Marie McTigue, his testimony on this subject being, in part, as follows:

"Q. You saw him [the defendant, Ted Miclau, Jr.] inside the door. What if anything was said by anybody at that time? A. Well he mentioned to us, he says I am sorry, but we are closed.

"Q. All right. A. And I answered that I am sorry, we had come in to buy a drink and he said well, the restaurant is closed, but the bar is open, go right ahead, and he pointed to the right."

After they were seated in a booth near the bar, they ordered drinks (Rose ordering gin and seven-up) which were served by a waitress and paid for by Rouby. The police, who had entered the Black Angus before Rouby and Rose then confiscated the gin served under the foregoing circumstances.

The waitress, who served the drink, when asked on cross-

examination about seeing Rose Marie McTigue in the restaurant earlier that evening said:

"Q. Did you see Rose McTigue in there earlier in the evening? A. I can't say that I did, sir.

"Q. Do you now deny seeing her earlier that evening? A. Yes, sir.

"Q. You deny it? A. Yes, sir.

"Q. Did you say to the police officer, to detective Faitz, in response to his question that the reason I served her is that I saw her in here earlier in the evening? A. I thought I saw her earlier in the evening.

"Q. You said that? A. I thought.

"Q. Did you say to the policewoman Rogers when she talked to you immediately after this was confiscated? A. Yes.

"Q. That the reason that you served her was because you saw her in there earlier in the evening and you assumed that she was of the proper age? A. They were all there at the same time.

"Q. They were all there at the same time. By that you mean whom? A. Mrs. Rogers.

"Q. And you said— A. I thought I seen her earlier in the evening.

"Q. And did you say anything further to Mrs. Rogers? A. That I thought I seen her earlier in the evening."

From the judgment of guilty of contributing to the delinquency of Rose Marie McTigue, a minor of fifteen years of age, by aiding and abetting and permitting the sale to her of intoxicating liquors, the defendant claims the following errors:

(1) The court below erred in failing to grant the defendant's motion for discharge upon conclusion of the state case for lack of evidence in failing to establish and prove, as provided for by law, that the defendant contributed to the delinquency of one Rose Marie McTigue.

(2) The court erred in having failed to discharge the defendant upon the conclusion of all the evidence, in the failure of the state to establish and prove that the defendant did aid, abet, induce, cause, encourage and contribute toward the delinquency of one Rose Marie McTigue.

(3) The court erred in finding the defendant guilty in hold-

ing that as the manager in charge of said business he was guilty of contributing to the delinquency, when he had no means of knowing of any violation of any laws having been committed by one of the employees in charge of the lounge operated by his employer.

(4) The court erred in failing to find from the evidence adduced that said violation in the sale of liquor was a pre-arranged plan and a trap set for the purpose of causing the sale in violation of the law as made and provided; that said finding of the court below is manifestly against the weight of the evidence and contrary to the Constitution of the state of Ohio.

(5) The court erred in holding the manager in charge guilty of contributing to the delinquency of a minor when he had no knowledge, nor did he participate, nor did he personally sell any intoxicating liquor to a minor, and by reason thereof the court held that the master was liable for the criminal acts of his servant in contributing toward the delinquency of the minor.

(6) And for such other and numerous errors as appear from the record of said case.

The criminal liability of the manager of a lounge bar for the sale of intoxicating liquor to a minor in violation of Section 4301.69, Revised Code, is established when the sale is made even though it is made by an employee acting within the general scope of his employment but in direct violation of instructions given in good faith not to sell liquor to minors. Not only does the sale of liquor to a minor by an employee in violation of instructions make the owner criminally liable for violating the liquor law but also of contributing to the delinquency of the minor. A single act may commit more than one crime if the elements of each are encompassed by the act.

In the case of *State* v. *Butler*, 38 Ohio Law Abs., 211, the charge was that the defendant contributed to the delinquency of Dick Butler, a minor. The syllabus is as follows:

''1. The selling or handling of intoxicating liquor by a minor under eighteen years of age constitutes an act of delinquency under Section 1639-2, General Code.

''2. The owner of an establishment where intoxicating liquors are sold, who leaves his fifteen year old son in such establishment to 'watch' a volunteer bartender while the owner is

absent on an errand, is guilty of acting in a way tending to cause delinquency of a minor under the provisions of Section 1639-45, General Code, if such minor sells intoxicating liquor to other minors during the owner's absence.''

A number of cases are collected in the annotations following the case of *Hershorn* v. *People,* 108 Colo., 43, 113 P. (2d), 680, reported in 139 A. L. R., 297, where the court held that the president and general manager of a corporation operating a night club who hires all its employees, directs its policies, supervises its business activities and is in complete control of the operation of the club, the business in effect being his own, is subject to criminal prosecution for the unlawful sale of liquor to a minor by a waiter in the club, even though he was not present and had no knowledge of such sale, where the statute prohibits sales to minors absolutely regardless of intent or scienter. The cases in the annotations begin at page 322.

Section 4301.69, Revised Code, provides:

''No person shall sell intoxicating liquor to a person under the age of twenty-one years or sell beer to a person under the age of eighteen, or buy intoxicating liquor for, or furnish it to, a minor, unless given by a physician in the regular line of his practice, or by a parent or legal guardian.''

The Colorado Code uses almost identical language. It provides: ''It shall be unlawful to sell * * * spirituous liquors to any person under the age of twenty-one years * * *.''

I am in complete agreement with the majority of the court that the facts of this case do not bring the case within the definition of ''entrapment.'' (See Black's Law Dictionary.)

Coming now to the question of whether or not the act of the officers in taking Rose Marie McTigue back to the Black Angus at 1:30 a. m. to see whether the employees would sell and the manager permit the sale of intoxicating liquors to the minor, as she had reported to them, is so completely against public policy as to prohibit them from testifying against a defendant as a result of carrying out such claimed conspiracy. I agree that a law-enforcing officer ought not to take part in a criminal conspiracy which might contribute to the delinquency of a minor child in seeking evidence in a criminal case and such conduct cannot be too severely criticized. The courts should not tolerate

the use of a minor to secure evidence in a case where the acts of the officers would be such as to contribute to the delinquency of a minor. But here, the police, having found two young girls, thirteen and fifteen years of age, in an intoxicated condition or under the influence of liquor, must have been motivated by an almost irrepressible desire to prosecute those guilty of creating or contributing to the condition in which they found these minors. It was unquestionably bad judgment to again expose Rose Marie McTigue to what would otherwise constitute an unlawful act for which she could be adjudged a delinquent after promises that if she would cooperate, she would not be punished. Yet, the acts of the officers could in no sense be called a conspiracy and their conduct should not give immunity to the defendant for his part in a violation of law which in part created the conditions which prompted and impelled the officers to act. Their acts (the officers') could not be called a "trap." If action is taken against offending officers under such circumstances, it should be done directly and as provided by law and not by attempting to collaterally punish them without charge or trial by giving immunity to one at least equally as guilty, if not guilty of more heinous conduct, at the expense of law enforcement. There is no such rule of immunity for law violations in this state. The defense of public policy, if such there be, is not that the defendant is not guilty but rather that they, the law enforcing officers, did not obtain the evidence against him legally. The illegal act charged against the defendant, which in this case is clearly shown even before the law enforcing officers were involved in the case, would thus go unpunished and the protection of society lessened when all violations of law should be vigorously prosecuted.

Much of the history behind the rule against unlawful search and seizure and so-called self incrimination was developed at a time when the defendant was without reasonable means to defend himself or to present his evidence and so found it impossible to overcome the advantages of the sovereignty in criminal prosecutions. The reasons for these rules as then known have long since vanished but the rules remain, perhaps for justifiable reasons, but such reasons are not here present. Here the defendant has not been called upon to give evidence against him-

self, nor have the rules of search and seizure been violated. The public policy of Ohio, if it could be called a public policy rather than what it is, that is, a rule of evidence, is that all relevant evidence is admissible in a criminal case and the collateral question of whether it was legally or illegally obtained is not an issue in the case. This was the common law rule recognized and adopted by the courts of this state. It should also be noted that the defendant did not object to the evidence secured by the officers in taking the prosecuting witness a second time to defendant's place of business.

In the case of *State* v. *Lindway,* 131 Ohio St., 166, 2 N. E. (2d), 490, the court said in paragraphs three, four, five and six of the syllabus:

"3. An officer of the law who makes search and seizure in a dwelling or other premises, without a warrant or with an illegal warrant, in contravention of Section 14, Article I, of the Constitution of Ohio, is a trespasser, and amenable to an action for such trespass.

"4. In a criminal case, evidence obtained by an unlawful search is not thereby rendered inadmissible, and, if otherwise competent and pertinent to the main issue, will be received against an accused.

"5. An application or motion to suppress or exclude such evidence made before trial or during trial is properly denied. The court need not concern itself with the collateral issue of how the evidence was procured. * * *

"6. The immunities from compulsory self-incrimination and unreasonable searches and seizures given by Sections 10 and 14, respectively, Article I, of the Constitution of Ohio, are not violated by the denial of such application or motion, and the admission of such evidence."

This case has been cited and followed in the cases listed below:

*City of Columbus* v. *Riggle,* 68 Ohio App., 15, 38 N. E. (2d), 323; *State* v. *Williams,* 69 Ohio App., 361, 41 N. E. (2d), 717; *City of Columbus* v. *Smith,* 78 Ohio App., 66, 65 N. E. (2d), 716; *City of Columbus* v. *Meadley,* 78 Ohio App., 490, 65 N. E. (2d), 719; *State* v. *Miller,* 85 Ohio App., 376, 88 N. E. (2d), 614; *City of Xenia* v. *Smith,* 34 Ohio Law Abs., 620, 39 N. E. (2d), 191;

*City of Columbus* v. *Treadwell*, 46 Ohio Law Abs., 367, 65 N. E. (2d), 720; *State* v. *Kendrick*, 52 Ohio Law Abs., 383, 83 N. E. (2d), 119; *City of Akron* v. *Stouffis*, 96 Ohio App., 105, 121 N. E. (2d), 307; *City of Columbus* v. *Gray*, 98 Ohio App., 464, 129 N. E. (2d), 857; *State* v. *Roche*, 72 Ohio Law Abs., 462, 135 N. E. (2d), 789.

The admissibility of evidence obtained by unlawful search and seizure is also considered in annotations found in 134 A. L. R., 819, 150 A. L. R., 566, 50 A. L. R. (2d), 533. It should be noted that the *Lindway case* and the cases that follow the law there decided are cited here only to show that evidence obtained by unlawful means is not for that reason to be excluded in a criminal case in Ohio. Here the constitutional provision for search and seizure was not violated. The defendant's constitutional rights were not infringed.

In the case of *Horton* v. *State*, 85 Ohio St., 13, 96 N. E., 797, the defendant was indicted for obtaining money under false pretenses. The prosecuting witness had paid certain money to the defendant upon his, the defendant's, promise to deliver to the prosecuting witness certain counterfeit money which he, the defendant, did not have or intend to sell and deliver when he procured the prosecuting witness's money. While the court held the indictment was not sufficiently clear and dismissed the charge on that ground, yet on the defendant's claim that such a claim could not be prosecuted where the prosecuting witness was attempting to act in violation of law, the court said:

"2. It is no defense to an indictment for obtaining money by false pretenses that the transaction in which the money was so obtained was unlawful."

In the case of *State* v. *Mellenberger*, 163 Ore., 233, 95 P. (2d), 709, 128 A. L. R., 1506, the court overruled *State* v. *Alexander*, 76 Ore., 329, 148 P., 1136, which had dismissed a defendant on the ground that he was *particeps criminis* in the criminal act charged. In the *Mellenberger case*, the defendant changed a punchboard number (a gambling device) to a winning number and demanded and received $10. The decision in paragraphs four and nine of the headnotes held that:

"4. Accused could not escape punishment for obtaining punchboard prize money by falsely pretending to hold winning

number and presenting to punchboard operator an altered non-winning number because of fact that operation of punchboard constituted violation of state law, since doctrine of particeps criminis was inapplicable.''

''9. On appeal from conviction for obtaining punchboard prize money by falsely pretending to hold winning number and presenting to punchboard operator an altered nonwinning number, the doctrine of 'stare decisis' did not preclude Supreme Court from overruling that part of a single prior decision which endeavored to infuse doctrine of particeps criminis into criminal law of state, where the prior decision was not preceded by oral argument, resort to doctrine of particeps criminis was unnecessary in the case, and the decision was not in agreement with spirit of times or judgment of subsequent tribunals.''

The use of evidence obtained by illegal search and seizure and other evidence illegally obtained was considered in an article written by Dr. John A. Wigmore, renowned authority, author, and teacher, on the subject of evidence which was published in 8 A. B. A. J., 479 (Aug. 1922). His conclusion is that the only question that can be raised as to such evidence is its relevance, not the way in which it was discovered. He said at the beginning of the article that:

''Necessity does not require, and the spirit of our law does forbid, the attempt to do justice incidentally and to enforce penalties by indirect methods. An employer may perhaps suitably interrupt the course of his business to deliver a homily to his office boy on the evils of gambling or the rewards of industry. But a judge does not hold court in a streetcar to do summary justice upon a fellow passenger who fraudulently evades payment of his fare; and, upon the same principle, he does not attempt, in the course of a specific litigation, to investigate and punish all offenses which incidentally cross the path of that litigation. Such a practice might be consistent with the primitive system of justice under an Arabian sheikh; but it does not comport with our own system of law. It offends, in the first place, by trying a violation of law without that due complaint and process which are indispensable for its correct investigation. It offends, in the next place, by interrupting, delaying, and confusing the investigation in hand, for the sake of a matter which is

not a part of it.  It offends, further, in that it does this unnecessarily and gratuitously; for since the persons injured by the supposed offense have not chosen to seek redress or punishment directly and immediately, at the right time and by the proper process, there is clearly no call to attend to their complaints in this indirect and tardy manner.  The judicial rules of evidence were never meant to be an indirect process of punishment.  It is not only anomalous to distort them to that end, but it is improper (in the absence of express statute) to enlarge the fixed penalty of the law, that of fine or imprisonment, by adding to it the forfeiture of some civil right through loss of the means of proving it.  The illegality is by no means condoned, it is merely ignored.

"For these reasons, it has long been established that the *admissibility of evidence is not affected by the illegality of the means through which the party has been enabled to obtain the evidence.*

"1841, Wilde, J., in *Com.* v. *Dana,* 2 Metc., 329 : 'Admitting that the lottery tickets and materials were illegally seized, still this is no legal objection to the admission of them in evidence. If the search warrant were illegal, or if the officer serving the warrant exceeded his authority, the party on whose complaint the warrant issued, or the officer, would be responsible for the wrong done.  But this is no good reason for excluding the papers seized, as evidence, if they were pertinent to the issue, as they unquestionably were.  When papers are offered in evidence the court can take no notice how they were obtained,—whether lawfully or unlawfully,—nor would they form a collateral issue to determine that question.'

"1875, Schofield, J., in *Stevison* v. *Earnest,* 80 Ill., 513, 518 : 'It is contemplated, and such ought ever to be the fact, that the records of courts remain permanently in the places assigned by the law for their custody.  It does not logically follow, however, that the records, being obtained, cannot be used as instruments of evidence; for the mere fact of [illegally] obtaining them does not change that which is written in them * * *.  Suppose the presence of a witness to have been procured by fraud or violence, while the party thus procuring the attendance of the witness would be liable to severe punishment, surely that could

not be urged against the competency of the witness. If he could not, why shall a record, although illegally taken from its proper place of custody and brought before the court, but otherwise free from suspicion, be held incompetent?''

The federal doctrine, as determined by *Boyd* v. *United States* (1885), 116 U. S., 616, 29 L. Ed., 746, 6 S. Ct., 524, and *Weeks* v. *United States* (1914), 232 U. S., 383, 58 L. Ed., 652, 34 S. Ct., 341, is illogical and leads to impractical results and has been repudiated by a majority of the states. But here, in addition to seeking support from the repudiated doctrines of illegal search and seizure and *particeps criminis,* as tactical defenses in criminal cases, the third, equally illogical tactical defense of ''public policy'' is being added when the constitutional rights of the defendant are in no way involved. This new philosophy, besides having no guidepost to limit its application, would bring about illogical results as do the others.

If a law-enforcing officer goes beyond the bounds of propriety in the exercise of his duties, he may be subject to discipline or prosecution, which ever the circumstances require, but his acts in developing competent evidence of the criminal conduct of another should not be held inadmissible and the defendant set free because of the manner in which the evidence, which shows him clearly guilty of a crime, was obtained. There is no legal justification for such result.

The court should not put the trial of a criminal case in a straight jacket at the expense of protection to minors against acts tending to establish delinquency induced or permitted by others. The holder of a liquor license is granted a privilege to engage in the sale of intoxicating beverages. It is his obligation in the management of such privilege to see to it that minors are not served intoxicating liquors in his establishment. If he accepts the privilege, he must also accept the full responsibility obtaining thereto. Here the facts which were presented by the evidence of the minors, and are not contradicted, are that the three minors were served intoxicating liquor in defendant's place of business before the return of Miss McTigue with the officers about which the majority of the court is so much concerned. The credibility of their testimony on this point is supported by the defendant's waitress who excused the ''sale'' on

the second occasion because she thought she remembered seeing them (the three minors) in the place earlier that evening. This testimony, together with the fact that the two girls who went to the police station were then noticably under the influence of liquor, is sufficient evidence to support the judgment here appealed without considering what happened under the direction of the officers.

In the case of *State* v. *Sobelman*, 199 Minn., 232, 271 N. W., 484, the owner of a place licensed to sell liquor was held guilty of contributing to the delinquency of a minor for permitting her (a girl sixteen years of age) to be in his place of business even though he was absent and did not know his servants permitted such conduct.

In the case of *State* v. *Clark*, 92 Ohio App., 382, 110 N. E. (2d), 433, it is said in the third paragraph of the syllabus:

"3. The portion of Section 1639-45, General Code, having to do with acts which in a way tend to cause delinquency presents a different concept. It does not follow that the minor must, as a result of such acts, become a delinquent. If the acts within themselves possess the nature and character as to probably lead the minor into the status of a delinquent, such acts may be considered as tending to cause delinquency."

From the foregoing authority, the contention that Rose Marie McTigue did not drink the liquor which was served by the defendant's servant on her second trip to the "Black Angus" would not relieve the defendant of committing an act tending to contribute to her delinquency. She was in his lounge bar where the defendant directed her to go. The fact that she did not drink the liquor which his establishment furnished for her was not prevented by any act on his part. Nor can the officers be charged with setting a trap by reason of the manner in which this minor was dressed. No change in her appearance was made between her first and second visit to the Black Angus.

From a complete reading of the record in this case, it is clear that substantial justice has been done and the judgment should be affirmed.